IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

EARLYSE ELY o/b/o )
ADRIENNE TURNER, )
                                        )
        **Plaintiff,** )
                                        )
vs. )        CIVIL ACTION NO 05-0012-D
                                        )
JO ANNE B. BARNHART, )
**Commissioner of Social Security,** )
                                        )
        **Defendant.** )

## ORDER

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of

a final decision of the Commissioner of Social Security denying her claim for Supplemental Security

Income.  This action was referred to the undersigned for report and recommendation pursuant to 28

U.S.C. §636(b)(1)(B).  The parties waived their right to proceed before a United States District Judge

and consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in

connection with this action. (Doc. 17)  This action was referred to the undersigned by Senior United

States District Judge Charles R. Butler, Jr. to conduct all proceedings and order the entry of judgment

in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Doc. 18)  Oral argument was held on

October 27, 2005.  Upon consideration of the administrative record, oral argument and the memoranda

of the parties, the decision of the Commissioner is **affirmed**

## I.    Issues on Appeal

1. Whether the Administrative Law Judge's (ALJ) finding that plaintiff's severe impairments did

not meet, equal or functionally equal Listing 112.05(D) is supported by substantial evidence?

2. Whether the ALJ committed reversible error by failing to consider the opinion of plaintiff's Special Education teacher?

## II.    Background Facts

Plaintiff was born December 9, 1993 and was thirteen weeks premature. (Tr. 183). She was nine years old at the time of the administrative hearing on March 5, 2003. (Tr. 435-437).   Plaintiff was in the third grade in special education classes. (Tr. 438-439).

## III.    Procedural History

On January 1, 1994, plaintiff qualified for supplemental security income due to low birth weight. (Tr. 25).  Following a continuing disability review, her disability was found to have ceased and benefits were terminated April 19, 1999. (Tr. 131-135).  A hearing on this unfavorable decision was held April 20, 2000 (Tr. 419-432) and the ALJ issued a decision August 3, 2000, wherein he found plaintiff was not disabled. (Tr. 15-29).  The Appeals Council remanded the case for further proceedings (Tr. 237-239) and a second hearing was held March 5, 2003. (Tr. 435-447).  On June 19, 2003, the ALJ issued a decision wherein he again found plaintiff was not disabled. (Tr. 30-35).  On December 1, 2004, the Appeals Council denied the request for review and the hearing decision became the final decision of the Commissioner of Social Security. (Tr. 5-7).[1]

## IV.    Findings of the Administrative Law Judge

The ALJ found that the medical evidence establishes that there has been medical improvement

_____

[1] The reconsideration stage and Appeals Council review process were eliminated from this case pursuant to a test of modifications to the disability determination procedure. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

since January 1994 when plaintiff was awarded benefits. (Tr. 29, 34).[2]  He found that the medical and

other evidence establish that plaintiff has the severe impairments of attention deficit hyperactivity

disorder and oppositional defiant/conduct disorder but her impairments singly or in combination did not

meet, equal, or functionally equal a listing in the Listings of Impairments (the Listings). 20 C.F.R. Pt

404, Subpt P, App. 1. (Tr. 29-30, 34).  The ALJ found plaintiff did not have a disabling limitation in

specific functions, a disabling limitation resulting from a chronic illness, or a disabling limitation resulting

from medical treatment. (Tr. 34).  The ALJ found plaintiff has a less than marked limitation in the

domains of acquiring and using information, attending and completing tasks, and interacting and relating

with others. (Tr. 30-33, 34).  He also found plaintiff had no limitation in the domains of moving about

and manipulating objects, caring for oneself, and health and physical well-being. (Tr. 30-33, 34).

## V.    Plaintiff's Grandmother's Testimony

At the hearing, plaintiff's grandmother testified as follows:

Plaintiff was in the third grade and attended special education classes.  She receives one on one

instruction in small classes. She can read a little but not like a normal third grade student. (Tr. 439).

She has difficulty writing and must learn math by repetition.  She has a tutor and her grandmother meets

with the special education teacher once a month. (Tr. 440).  Her behavior at school is disruptive and

she is placed in time out or writes for punishment. (Tr. 441).  At home, plaintiff asks her grandmother to

repeat questions and is not organized with her possessions. (Tr. 442). She is given chores but only half

---

[2]  Plaintiff was initially awarded benefits as a low birth weight premature infant.  The ALJ found
that she had medically improved from that status.  (Tr. 25).  Plaintiff has not challenged the finding of
medical improvement.

performs them. (Tr. 442).

Plaintiff is not involved in community groups but attends church every other Sunday when her grandmother is off from work. (Tr. 443). She sees a psychiatrist and a therapist every month at the Lemoine Center, a mental health facility for children. (Tr. 443-444). The psychiatrist prescribed medication for sleep which helps to calm her down to sleep. (Tr. 444-445). The psychiatrist also prescribed another medication, Adderall, to calm plaintiff during the day because she is hyperactive. Plaintiff takes her medication every day and the Adderall helps her hyperactivity. (Tr. 444-445). She has no difficulty obtaining medication except once when the medical staff was on vacation. (Tr. 445).

Plaintiff had a friend in the neighborhood but she moved. She does not have close friends at school and no one calls the house to talk with her. (Tr. 445-446). After school, plaintiff has a tutor-babysitter every day who helps with homework and cares for her. (Tr. 446). Plaintiff is not being treated for any physical ailments. (Tr. 446). Her grandmother believes that plaintiff is not an ordinary nine year old but the medication "helps her very much." (Tr. 446).

## VI.    Analysis

### A.    Standard of Review.

In reviewing claims brought under the Act, this court's role is a limited one. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)). Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such

4

relevant evidence as a reasonable person would accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971); Crawford v.

Commissioner of Social Security, 363 F. 3d 1155, 1158-1159 (11th Cir. 2004); Bloodsworth, 703 F.

2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence

even when a court finds that the preponderance of the evidence is against the decision of the

Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); Crawford, 363 F. 3d at 1158-

1159; Bloodsworth, 703 F.2d at 1239.   "In determining whether substantial evidence exists, we must

view the record as a whole, taking into account evidence favorable as well as unfavorable to the

[Commissioner's] decision."  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Further, it has

been held that the Commissioner's "failure to apply the correct law or to provide the reviewing court

with sufficient reasoning for determining that the proper legal analysis has been conducted mandates

reversal." Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  This court's review of the

Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th

Cir. 1987).

### B.      Statement of the Law for Children

The Personal Responsibility and Work Opportunity Act of 1996 became effective on August

22, 1996.  See Pub.L. No. 104-193, 110 Stat. 2105 § 211(b)(2) (1996) (codified at 42 U.S.C. §

1382c).  This legislation defined childhood disability as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this
> subchapter if that individual has a medically determinable physical or mental impairment,
> which results in marked and severe functional limitations, and which can be expected to
> result in death or which has lasted or can be expected to last for a continuous period of
> not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (1997).  The regulations state that an "impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." 20 C.F.R. § 416.924(d) (2000).

The regulations set forth a three-step sequential evaluation process which applies to a childhood disability determination:

> We follow a set order to determine whether you are disabled. If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further. If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a) (2000).  At step one, plaintiff's age and work activity, if any, are identified.  At step two, the severity of plaintiff's impairments is identified.  A severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c) (2000).  At step three, if plaintiff has a severe impairment, then plaintiff must establish that his or her impairment or combination of impairments meets or medically equals in severity and duration, an impairment listed in the Listings of Impairments (the Listings). 20 C.F.R. Pt. 404, Subpt P, App. 1.  If not, then the Commissioner must determine whether plaintiff's impairments or combination of impairments functionally equal the criteria for a Listing. 20 C.F.R. §416.926a(a) (2000) ("If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that

6

functionally equal the listings.  By 'functionally equal the listings,' we mean that your impairment(s) must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section.").[3]

To determine functional equivalence, the Commissioner must consider plaintiff's limitation of specific functioning, broad areas of development, episodic impairment, and effect of treatment or medication. 20 C.F.R. § 416.926a(b).  To determine plaintiff's level of function in the broad areas of development, the ALJ must address six domains of development or functioning: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i-vi)(2000).  If plaintiff has an extreme limitation in one domain or marked limitation in two domains, a finding of functional equivalence will be made. 20 C.F.R. § 416.926a(d),(e),(f) (2000). [4]

An extreme limitation of function occurs when the impairment "interferes very seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(3)(i) (2000).  This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities, and is given to the "worst limitations." Id.  Also, the regulations state that an extreme limitation is "the equivalent of the functioning we would expect to find

_____

[3] The regulations set forth that an "impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." 20 C.F.R. § 416.924(d) (2000).

[4] The regulation sets forth the methods for using each domain to evaluate functional equivalence to a listing. 20 C.F.R. § 416.926a(f)-(l) (2000).

7

on standardized testing with scores that are at least three standard deviations below the mean." <u>Id.</u> [5]

A marked limitation of function occurs when the impairment "interferes seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(2)(i) (2000). This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities. <u>Id</u>. Also, the regulations state that a marked limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." <u>Id.</u> [6]

## C.    <u>Medical Improvement</u>

Disability claimant's cases are periodically reviewed to determine whether the claimant has medically improved to the extent that he or she is no longer disabled. 20 C.F.R.§ 416.994a(a). The regulations set forth a specific process to determine whether disability has ceased. <u>Id</u>. at (b). Step one involves a determination whether there has been medical improvement. <u>Id.</u> at (b)(1). If so, then at step two, a determination must be made as to whether the claimant's impairment or combination of impairments meet or medically equal the listing met or equaled at the time of the most recent favorable decision. <u>Id</u>. at (b)(2). If so, even though the claimant has medically improved, then the claimant will be

---

[5] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(2)(i)-(iv) (2000). Additionally, 20 C.F.R. §416.926(e)(4) explains the method for consideration of standardized test scores.

[6] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(2)(i)-(iv) (2000). Additionally, 20 C.F.R. § 416.926(e)(4) explains the method for consideration of standardized test scores.

considered disabled unless the claimant falls within a narrow group of exceptions. Id.   If the impairment

or combination of impairments do not meet or equal the listing, then the claimant proceeds to the third

step wherein a determination is made as to whether the claimant is currently disabled under the rules in

20 C.F.R. § 416.924(c) and (d).  The regulation requires a consideration of all impairments, including

those not in existence or unknown at the time of the most recent favorable decision or not considered at

that time.  The decision follows a three step analysis: Whether the claimant has a severe impairment or

combination of impairments; whether the claimant's impairment or combination of impairments meet or

medically equal a Listing; and if not, whether they functionally equal the listings. 20 C.F.R. §

416.994a(b).

### D.    Medical Evidence

**IQ and psychological testing**

On February 4, 1999, when plaintiff was five years old, she was consultatively examined by

Patricia McCleary, Ph.D. (Tr. 157-159).  Dr. McCleary noted plaintiff's low birth weight and her

grandmother's report that she met developmental milestones, such as talking and walking, at

appropriate ages.  Dr. McCleary noted the report that plaintiff could not read, write or spell her name

and was on no medication.  The doctor found plaintiff was alert, attentive and very cooperative and that

the evaluation was considered valid and reliable.  She noted plaintiff "exhibited good attention, was able

to stay on task, and only tended to fidget a little throughout the evaluation." (Tr. 158).  Dr. McCleary

also found plaintiff's thinking was clear and coherent, affect was stable, mood was cheerful, speech was

logical and at a normal rate, and that she was oriented to person and place but not time, and could

follow simple verbal commands but had problems with complex commands, naming common items in

9

her environment, and recall of words. (Tr. 158). Dr. McCleary also noted plaintiff was in Headstart and was independent in activities of daily living, showed no severe psychiatric problems and her behavior was appropriate, and that plaintiff's grandmother reported no impairment of plaintiff's daily functioning or her ability to engage in age appropriate activities. (Tr. 159).

Dr. McCleary administered the Wechsler Preschool and Primary Scale of Intelligence (WPPSI) and plaintiff scored a verbal IQ score of 67, a performance IQ score of 74 and a full scale IQ score of 67 which placed plaintiff in the mild mental retardation range. Plaintiff was diagnosed with mild mental retardation. (Tr. 158-159).

On August 7, 2000, Gayle Bishop, a psychometrist for the Board of School Commissioners of Mobile County evaluated plaintiff for her special education placement. Plaintiff was six years and seven months old at the time of the evaluation. Bishop administered the Wechsler Intelligence Scale for Children- III. Plaintiff obtained a verbal IQ score of 82, a performance IQ score of 78, and a full scale IQ score of 78. (Tr. 290). Bishop found that the test conditions were good, plaintiff was cooperative and friendly but that plaintiff's listening skills were weak and she "seemed to have difficulty paying attention to questions." (Tr. 289). The psychometrist found that the results were a reliable and valid estimate of plaintiff's current level of functioning. (Tr. 289).

The psychometrist also administered the Devereux Behavior Rating Scale-School Form, and the Scales of Independent Behavior-Revised. She also obtained information from plaintiff's teacher's observations and an environmental, cultural and economic concerns checklist. (Tr. 291-293). The psychometrist then recommended that plaintiff receive instruction in her areas of weaknesses including simple and specific instructions, improving listening skills, behavior management, and a working

10

relationship with the home. The psychometrist also recommended adjustments to plaintiff's classroom and learning environment to minimize visual and auditory distractors because of the indication of possible difficulties with attention, concentration, and the "ability to remain undistracted by outside factors." (Tr. 293).

On March 6, 2001, plaintiff was consultatively examined by Lucille T. Williamson, Psy.D. (Tr. 307-309). Dr. Williamson noted plaintiff's grandmother's report of mental slowness, behavior problems at home and school, and ADHD and for which plaintiff was prescribed Adderall. On examination, she observed plaintiff was appropriately dressed and groomed and had no physical impairment. She found plaintiff was oriented to time and place but not situation and attended to task in an age appropriate manner but was "attentive to everything in the room especially the computer". (Tr. 308). She found plaintiff's thought processes were intact and affect was normal and appropriate. She found plaintiff related in an "age-appropriate but active manner" and appeared to "relate socially in an age-appropriate manner." (Tr. 309). She found that no behavior problems were noted during the evaluation but plaintiff had little insight and understanding of herself and her judgment was poor. (Tr. 309). Dr. Williamson concluded that plaintiff was motivated, friendly and cooperative during the examination and that she would likely "continue to progress as treatment continues." (Tr. 309).

On December 9, 2002, plaintiff was consultatively examined by John W. Davis, Ph.D. (Tr. 382-386). Dr. Davis noted plaintiff's grandmother's report of her low birth weight and that plaintiff was slow with a history of disruptive behavior at home and school requiring mental health treatment for several years. He noted the grandmother's report of improved behavior with medication for ADHD and oppositional defiant disorder but there were still problems. On mental status examination, Dr.

11

Davis found plaintiff was normal in general appearance and behavior, speech, mood and affect, orientation, memory, abstractions but for an inability to interpret proverbs, and thought content. (Tr. 383-384). He found her thought processes were simple and limited, her fund of information was also limited, and her judgment and insight were "limited due to her self-centered nature and her difficulty in her impulse control". (Tr. 384).

Dr. Davis stated that plaintiff was not able to say her ABC's, count to ten or name colors but he felt that

> she has something of a tendency to tease and it is felt that she does truly know these simple exercises and is teasing this examiner. It would seem that a teacher or others working with her could easily become frustrated with this behavior and it could turn negative very quickly.

(Tr. 383-384).

Dr. Davis administered the Wechsler Intelligence Scale for Children -III under good conditions and plaintiff was cooperative. However, he found that the "results [were] an underestimation of her overall abilities. As mentioned previously, this claimant seemed to enjoy teasing the examiner. She was quick to say "I don't know" and generally ADHD problems of concentrating and focusing were seen." (Tr. 385). Plaintiff scored a full scale IQ score of 78, a verbal IQ score of 81 and a performance IQ score of 80 which Dr. Davis interpreted as placing her in the borderline intellectual range. (Tr. 385). He noted plaintiff interacts with other children at school and home, watches television, colors, enjoys skating and occasionally goes to church. He diagnosed ADHD and oppositional defiant/conduct disorder improved with medication and bed-wetting by history. (Tr. 385).

Dr. Davis prognosis was that plaintiff was "struggling with the problems associated with ADHD,

particularly focusing, concentrating, and controlling her impulses, even though she is on medication" and that the grandmother was conscientious in seeking treatment. (Tr. 385). He found plaintiff has the "ability to do simple, routine, repetitive type tasks" and "[s]he can get along with others." (Tr. 386).

### Medical records

Plaintiff was treated at USA Children's Medical Center following her birth for routine infant and child health care and vaccinations. (Tr. 356-382, 174-201). In October 1999, at five and half years old, plaintiff was diagnosed with ADHD combined type based on the report of her kindergarten teacher and grandmother and was referred to Mobile Mental Health Center. (Tr. 357- 360).

### Mobile Mental Health Center - Lemoine Center

Plaintiff began treatment at Mobile Mental Health Center in November 1999 for ADHD and oppositional defiant/conduct disorder. (Tr. 202-213). She was initially prescribed Adderall and her dosage was adjusted as family therapy continued. (Tr. 202-207). In June 2000, plaintiff's doctor, Sandra Parker, noted her grandmother's continued report of behavioral problems (put fingernail polish on sheets; poured salt on the stove) but a change in discipline was improving plaintiff's behavior. (Tr. 353). Dr. Parker indicated plaintiff would continue her current medications and that "this is a discipline, supervision issue, will not adjust meds at this time." (Tr. 353). In September 2000, plaintiff's grandmother reported plaintiff had been placed in special education, liked her teacher, her behavior was improving and "her medication was keeping her calm." (Tr. 348). In October 2000, plaintiff's grandmother reported plaintiff was in trouble at school and home. (Tr. 347). In 2001, plaintiff's grandmother reported periods of good behavior and bad behavior which consisted mostly of arguments, disrespectful behavior, and tantrums at home and school. (Tr. 232-244)

In January 2002, a sleep medication, Tenex, was added because plaintiff's grandmother reported plaintiff would not go to sleep. (Tr. 331-334). Another medication, Trazodone, was added in April 2002, for behavior and in September 2002, plaintiff was changed to Adderall XR (extended release). (Tr. 325, 317). Throughout 2002, plaintiff's grandmother continued to report episodes of good behavior and calm temperament and episodes of bad behavior (temper tantrums, throwing food, playing with toys in bed instead of sleeping). (Tr. 317-331).

In April and August 2002, plaintiff was examined by V. Dillon a medical doctor at the Center. In April, Dr. Dillon noted the grandmother's report that two years ago plaintiff had set fire to a relatives shoes because she was angry with him. (Tr. 325). Dr. Dillon found plaintiff was oriented, alert and well developed, and had fluent and goal directed speech, neutral mood, appropriate affect, good eye contact. (Tr. 327). He also found plaintiff had a fair to good wealth of knowledge, knew the days of the week and the months of the year, knew the alphabet, could spell words like "dog" and "live" forward and backward, recite five digits forward and three in reverse, and could count to twenty. He found her recall was unencumbered but for her immediate recall which was poor and her insight and judgment were intact for every day situations. (Tr. 327).

Most recently, on February 4, 2003, plaintiff was interviewed for medication management and her grandmother reported poor sleep patterns. Plaintiff's medications were adjusted. The assessment of current symptoms did not indicate any problem but for poor sleep including no problems in concentration, behavior or mood with medication. (Tr. 418). On March 27, 2003, plaintiff met with her counselor and her grandmother reported decreased interruptions and arguments but that plaintiff had broken the television remote control and had tried to help clean the house by cleaning the windows

14

and walls with furniture polish.  She was counseled about being careful and not breaking things and asking permission before she tries to help.  The assessment of current symptoms did not indicate any problems including no problems in concentration, behavior or mood. (Tr. 417).  On April 1, 2003, plaintiff saw Dr. Dillon at the Center and her grandmother reported impulsiveness and poor attention at home.  Plaintiff's medication was changed from Adderall to Strattera. (Tr. 415). The last record was dated May 12, 2003.   The counselor's notes are not entirely legible but her assessment of current symptoms did not indicate any problems including no problems in concentration, behavior or mood. (Tr. 414).  It appears that plaintiff continued to talk back and disobey her grandmother and had hit the family dog because she thought it was going to bite her.  Plaintiff was counseled on respect for people and animals. (Tr. 414).

### Teacher questionnaire and other information

On March 7, 2003, plaintiff's full-time special education teacher Paulette Maurin completed a teacher questionnaire. (Tr. 400-408).[7]  In regard to acquiring and using information, the questionnaire contained a "problem" rating scale: (1) no problem; (2) slight; (3) obvious; (4) serious; and (5) very serious. (Tr. 401).  Plaintiff scored "very serious" in "expressing ideas in written form"; "serious" in "reading and comprehending written material" and "comprehending and doing math problems"; "obvious" in "comprehending oral instructions", "comprehending school and content vocabulary", "providing organized oral explanations and adequate descriptions", "learning new materials", and

---

[7]  Maurin indicated that plaintiff was mainstreamed into the third grade class with an aide for one hour per week in language. (Tr. 400).  Her special education class ratio is three adults (one teacher, one aide and a volunteer) to eight students. (Tr. 400).

"recalling and applying previously learned material;" and "slight" in "understanding and participating in class discussions" and "applying problem solving skills in class discussion." (Tr. 401).

In regard to attending and completing tasks, the questionnaire applied the same rating scale and the teacher found plaintiff had "serious" problems with "organizing own things or school material" and "working at reasonable pace/ finishing on time"; an "obvious" problem "focusing long enough to finish assigned activity or task", "carrying out multi-step instructions", "completing class/homework assignments", "completing work accurately without careless mistakes", and "working without distracting self or others"; and a "slight" problem "paying attention when spoken to directly", "sustaining attention during play/sports activities", "refocusing to task when necessary", "carrying out single step instructions", "waiting to take turns", and "changing from one activity to another without being disruptive." (Tr. 402).[8]

> Plaintiff's teacher also provided a progress report wherein she wrote as follows:
>
> Adrienne is doing a great job on her oral reading and her star reading tests. We are still working hard on our writing and penmanship. We have done much better this quarter on our behavior as we have had no episodes or outbursts. In her math, she is doing a good job on regrouping and money & coin combinations. We are now working on time increments. Keep up the good work.

(Tr. 411). In an undated letter from Maurin, she identified the disruptive behavior plaintiff exhibits "when not on her medication" and outlined the behavior modification program she has applied to curb

---

[8] Plaintiff was also evaluated in the domains of interacting and relating with others (some limitations were identified and plaintiff was on a behavior modification program and time-out), moving about and manipulating objects (no limitation), caring for herself (limitations were identified including some "accidents" and a difficulty with finger foods resulting in messed clothes), and medical conditions and health and physical well-being (the teacher indicated plaintiff took medication for ADHD at home). (Tr. 404-406). Plaintiff has not challenged the ALJ's finding in these domains.

plaintiff's outbursts and negative behavior. (Tr. 396).

     **E.**     <u>**Plaintiff's Argument**</u>

     **1. Whether the Administrative Law Judge's (ALJ) finding that plaintiff's severe impairments did not meet, equal or functionally equal Listing 112.05(D) is supported by substantial evidence?**

     Plaintiff argues that she has a valid verbal IQ score of 67 and a valid full scale IQ score of 67 which meet the first prong of Listing 112.05(d). Plaintiff argues that her severe impairments of attention deficit hyperactivity disorder (ADHD) and oppositional defiant disorder (ODD) satisfy the second prong of the Listing. Plaintiff also argues that she has ADHD even while on her medication and supports this argument by reference to the opinion of John W. Davis, Ph.D. (Tr. 385). Thus, plaintiff argues that the ALJ committed reversible error when he failed to find that she met this Listing.

     Plaintiff also argues that her severe impairments functionally equal the Listing. Plaintiff asserts that the ALJ erroneously found that she had less than marked limitation in the domains of acquiring and using information and attending and completing tasks (Tr. 30-33, 34). Plaintiff argues that her special education teacher's report and the opinion of Dr. Davis support a finding of marked limitation in these domains. (Tr. 385, 400-408).

     The ALJ found plaintiff has the severe impairments of attention deficit hyperactivity disorder and oppositional defiant / conduct disorder. (Tr. 34). However he did not find that plaintiff met, equaled or functionally equaled Listing 112.05(d) of the Listings of Impairment. (Tr. 29-30). The ALJ found as follows:

     The final question for determination is whether the claimant's impairments meet,

medically equal or functionally equal a listed impairments contained in Appendix, 1 Subpart P, Regulation No. 4 using the regulations that went into effect on January 2, 2001. There is no medical opinion in the record stating that the claimant meets or medically equals a listed impairment. (See Social Security Ruling 96-3p) Based on the evidence contained in the record, the undersigned [ALJ] finds that the claimant's impairments do not meet or medically equal a listed impairment. Therefore, the final determination is whether the claimant's impairments cause limitations which are functionally equivalent to the limitations found in any listed impairment. Listed impairments related to mental retardation at listing 112.05, oppositional defiant disorder at listing 112.08 and ADHD at listing 112.11 have been considered.

(Tr. 29-30). The ALJ then discussed the factors he must consider in determining whether plaintiff functionally equals a listing including the factors identified in 20 C.F.R. § 416.926a and the six domains for evaluation set forth therein. The ALJ found plaintiff had a less than marked limitation in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others. (Tr. 30). He found plaintiff had no limitation in the domains of moving about and manipulating object, caring for oneself, and health and physical well-being. (Tr. 30).

In discussing the domain of acquiring and using information, the ALJ discussed plaintiff's IQ test scores. He stated as follows:

Psychological testing performed in August, 2000 and January 2003, yielded almost the same valid IQ scores: Verbal IQ score of 82 in 2000 and 81 in 2003; Performance IQ score of 78 in 2000 and 80 in 2003; and Full Scale IQ scores of 78. The undersigned acknowledges that psychological testing performed in February, 1999 produced a Full Scale IQ of 67, thereby placing plaintiff in the borderline range of mild mental retardation. However, the undersigned cannot assign any significant evidentiary weight to these test results because just a year and a half later, the claimant performed significantly better on the WISC-III.

(Tr. 31). The ALJ also discussed the plaintiff's successful completion of the first and second grades in special education and the information from plaintiff's special education teacher's questionnaire responses. Specifically, he noted the teacher's report that plaintiff has a "serious problem in the areas

18

of reading and comprehending written materials and expressing ideas in written form" but also noted that the teacher recently reported plaintiff's reading was improving.[9]  Based upon this information, the ALJ then found plaintiff has a "less than marked degree of functional limitation in this domain." (Tr. 31).

In discussing the domain of attending and completing tasks, the ALJ found plaintiff's "ADHD causes the claimant general problems with concentrating and focusing despite her use of medication" and referenced the teacher's report that plaintiff "experienced problems paying attention, focusing, processing, and completing work tasks." (Tr. 31).  However, he then found that despite the problems associated with ADHD, plaintiff's treatment records from Mobile Mental Health Center and the special education teacher's progress report of March 2003, indicated plaintiff was "improving both academically and behaviorally". (Tr. 31-32).  He also referenced Dr. Davis' opinion that plaintiff could perform "simple, routine, repetitive type tasks." (Tr. 32).  Based upon this information, the ALJ then found plaintiff has a "less than marked degree of functional limitation in this domain." (Tr. 32).

Listing 112.05(D) requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function. 20 C.F.R. Pt 404, Subpt. P, App. 1.  The Eleventh Circuit explained the purpose and application of the Listing of Impairments, as follows:

> The Listings include medical criteria for specified disorders of thirteen major body systems.  These impairments are so severe that an individual who has a listed impairment is generally considered unable to work based upon medical considerations alone. 20 C.F.R. § 416.925(a). A claimant may prove that he is disabled by either (1) meeting the Listings or (2) equaling the Listings.  In order to meet a Listing, the claimant must (1) have a diagnosed condition that is included in the Listing and (2) provide

---

[9] Plaintiff was nine years old and in the third grade at the time of the hearing. (Tr. 23, 31).

> objective medical reports documenting that this condition meets the specific criteria of the applicable Listing and the duration requirement. A diagnosis alone is insufficient. 20 C.F.R. §416.925(c)-(d). In order to equal a Listing, the medical findings must be at least equal in severity and duration to the listed findings.

Wilkinson on behalf of Wilkinson v. Bowen, 847 F. 2d 660, 663 (11th Cir. 1987); see also Bell v. Bowen, 796 F. 2d 1350, 1353 (11th Cir. 1986) ("when a claimant contends that he has an impairment meeting the listed impairments . . . , he must present specific medical findings that meet the various tests listed under the description of the applicable impairment[.]"); see also Carnes v. Sullivan, 936 F. 2d 1215, 1218 (11th Cir. 1991) ("diagnosis of a listed impairment is not alone sufficient; the record must contain corroborative medical evidence supported by clinical and laboratory findings.") Moreover, the United States Supreme Court has found:

> Each impairment [in the Listings] is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.

Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891-92 (1990) (emphasis in original).

In order to prove equivalency to a listed impairment, plaintiff must provide objective medical findings that support each of the criteria for the impairment under which he claims equivalency. Bell, 796 F.2d at 1353 ( "if in the alternative [claimant] contends that he has an impairment which is equal to one of the listed impairments, the claimant must present medical evidence which describes how the impairment has such equivalency."). Plaintiff must show that the impairments produce functional limitations or restrictions equivalent to those required under the particular listing. Objective tests must be present to support a finding of equivalence. 20 C.F.R. § 416.926(a); see Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-892 (1990). Also, the medical findings must be at least equal in severity

and duration to the listed findings. Wilkinson, 847 F. 2d 662. Plaintiff has the burden of producing

medical evidence that establishes all of the required medical findings. See Bowen v. Yuckert, 482 U.S.

137, 146 & n.5, 107 S.Ct. 2287 (1987); see also 20 C.F.R. § 416.926 (determining medical

equivalence for adults and children); 20 C.F.R. § 416.926a (determining functional equivalence for

children).

 Plaintiff argues that her IQ scores of 67 from February 1999 meet the first prong of Listing

112.05(d) - a valid IQ score between 60 and 70, and that her severe impairments of ADHD and

oppositional defiant/conduct disorder meet the second prong - an additional and significant mental

limitation of function. However, the undersigned finds that there is substantial evidence in the record to

support the ALJ's determination that plaintiff does not have a current[10] valid IQ score between 60 and

70 such that would meet the first prong of the Listing. (Tr. 31). As the ALJ noted, psychological testing

in August, 2000 and January 2003, yielded IQ scores of above 70 with the lowest score being 78. (Tr.

31). Additionally, the psychological evaluation and IQ test results from the most recent testing by Dr.

Davis in January 2003 were interpreted as "an underestimation of her overall abilities" and that plaintiff

is "probably capable of functioning in at least the low average range." (Tr. 385, 382-386).

 Accordingly, upon consideration of the more recent IQ test results, plaintiff's performance in

her special education classes, and the reports of her mental health counselor, the undersigned finds that

---

[10] "IQ test results must also be sufficiently current for accurate assessment under 112.05. . . . IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above." 20 C.F.R. Pt. 404, Subpt. P, App. 1

the ALJ did not err in determining that plaintiff failed to meet Listing 112.05(d).[11]    Because the first

prong of the Listing was not met, the court need not determine whether plaintiff met the second prong.

Plaintiff also argues that the ALJ erred by failing to find she functionally equals the Listing.

Plaintiff argues that the evidence supports a finding that she has a marked impairment in the domains of

acquiring and using information and attending and completing tasks.  Thus, under 20 C.F.R. §

416.926a(d),(e),(f) (2000) a finding of functional equivalence should be made since  plaintiff has an

extreme limitation in one domain or a marked limitation in two domains.

In terms of the domain of acquiring and using information, plaintiff relies upon her 1999 IQ

scores of 67 (Tr. 157-159), in addition to her special education teacher's responses in this area on the

questionnaire.  In regard to the domain of attending and completing tasks, plaintiff also relies upon

Maurin's responses and Dr. Davis' statement that she is "struggling" with the problems of ADHD. (Tr.

385).

However, in making a functional equivalence assessment the ALJ is not required to rely upon

one set of test scores.[12]  The ALJ considered Maurin's responses, the progress reports of her mental

---

[11] The intelligence test score of 67 from the 1999 IQ test may not be sufficiently current since
plaintiff was only five and thus, this score was only valid for one year.  See fn.10.

[12] (4) How we will consider your test scores.

(i) As indicated in § 416.924a(a)(1)(ii), we will not rely on any test score alone. No
single piece of information taken in isolation can establish whether you have a "marked"
or an "extreme" limitation in a domain.

(ii) We will consider your test scores together with the other information we have about
your functioning, including reports of classroom performance and the observations of
school personnel and others. . . .

health counselors, and the results of the consultative psychiatric evaluation with Dr. Davis in reaching his decision that plaintiff had a less than marked limitation in the two domains. (Tr. 29-32). "The ALJ's task is to examine the evidence and resolve conflicting reports." Wolfe v. Chater, 86 F.3d 1072, 1079 (11th Cir. 1996) citing Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam); Grant v. Richardson, 445 F.2d 656 (5th Cir.1971) (per curiam) ("Moreover, the resolution of any conflict in the evidence, including conflicting medical opinions, as in the case at hand, and the determination of questions of credibility of the witnesses are not for the court; such functions are solely within the province of the Secretary."); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946.

Plaintiff points to a few of the many findings made by her special education teacher to support her argument. However, the undersigned finds that the ALJ did not commit error for failing to choose only the findings favorable to plaintiff from among those made by Maurin. Even though Maurin indicated serious and very serious problems in three areas relevant to acquiring and using information, ("very serious" in "expressing ideas in written form"; "serious" in "reading and comprehending written material" and "comprehending and doing math problems") the remaining seven areas were rated at slight and obvious. (Tr. 401-402).[13] In the domain of attending and completing tasks, Maurin found

_____

20 C.F.R.§ 416.926a(e)

[13]  Plaintiff was scored as having an "obvious" problem in "comprehending oral instructions", "comprehending school and content vocabulary", "providing organized oral explanations and adequate descriptions", "learning new materials", and "recalling and applying previously learned material;" and a "slight" problem in "understanding and participating in class discussions" and "applying problem solving skills in class discussion." (Tr. 401).

23

two serious problems ("serious" problems with "organizing own things or school material" and "working at reasonable pace/ finishing on time") but the remaining eleven areas were rated at slight or obvious. (Tr. 402).[14]

Additionally, the ALJ also considered Maurin's progress report on March 2003 wherein she stated as follows:

> Adrienne is doing a great job on her oral reading and her star reading tests. We are still working hard on our writing and penmanship. We have done much better this quarter on our behavior as we have had no episodes or outbursts. In her math, she is doing a good job on regrouping and money & coin combinations. We are now working on time increments. Keep up the good work.

(Tr. 411). Also, in an undated letter, Maurin identified the disruptive behavior plaintiff exhibits "when not on her medication" and discussed the behavior modification program which was used to curb plaintiff's outbursts and negative behavior. (Tr. 396).

Plaintiff also relies upon Dr. Davis' statement that plaintiff is struggling with the affects of her ADHD. However, Dr. Davis also found that plaintiff functioned in the borderline intellectual range, was not mentally retarded and that despite her struggle with "focusing, concentrating, and controlling her impulses, even though she is on medication", he found plaintiff has the "ability to do simple, routine, repetitive type tasks" and "[s]he can get along with others." (Tr. 385-386).

Accordingly, the undersigned finds that the ALJ's decision that plaintiff did not functionally

---

[14] Maurin found an "obvious" problem "focusing long enough to finish assigned activity or task", "carrying out multi-step instructions", "completing class/homework assignments", "completing work accurately without careless mistakes", and "working without distracting self or others"; and a "slight" problem "paying attention when spoken to directly", "sustaining attention during play/sports activities", "refocusing to task when necessary", "carrying out single step instructions", "waiting to take turns", and "changing from one activity to another without being disruptive." (Tr. 402).

equal Listing 112.05(d) is supported by substantial evidence in the record.[15]  Further, the undersigned also finds that the ALJ did not err by finding that plaintiff has a less than marked limitation in the domains of acquiring and using information and attending and completing tasks.

**2. Whether the ALJ committed reversible error by failing to consider the opinion of plaintiff's Special Education teacher?**

Plaintiff argues that the ALJ mentioned the special education teacher's responses to the teacher questionnaire but did not indicate the weight given to the teacher's opinion.  Plaintiff also argues that teachers are a valid source in making a severity determination and that if the ALJ had properly considered the teacher's report that plaintiff had serious and very serious problems in the domains of acquiring and using information and attending and completing tasks he would have found plaintiff had marked impairments in these domains.  Plaintiff also argues that Dr. Davis' assessment of the plaintiff wherein he found she was struggling with problems of ADHD particularly focusing, concentrating and controlling her impulses, supports the special education teacher's opinion as expressed on the questionnaire, and in turn, supports a finding that plaintiff has marked impairments in the two domains.

As previously discussed in the section addressing whether plaintiff functionally equaled Listing 112.05(d), the ALJ summarized Maurin's questionnaire responses (Tr. 28-29) and considered her questionnaire responses independently in reaching his functional equivalence determination for the domains of acquiring and using information, attending and completing tasks and interacting and relating

---

[15]  Though not specifically referenced by the ALJ, the report of Dr. Williamson from March 2001, indicated that plaintiff "attends to tasks in an age appropriate manner except that she is attentive to everything in the room, especially the computer" and that was "likely [plaintiff] will continue to progress as treatment continues." (Tr. 308, 309).

with others. (Tr. 29-32). As was his duty, he examined the evidence and resolved conflicting reports. Wolfe, 86 F.3d at 1079; Grant, 445 F.2d 656 (5th Cir.1971) (per curiam); 20 C.F.R. § 404.1546, 20 C.F.R. § 416.946. Simply because the ALJ found other evidence more persuasive, including evidence from Maurin that plaintiff is improving in her ability to read, write and compute and that plaintiff does not exhibit certain behaviors when she is on her medication, does not support a determination that he improperly evaluated the questionnaire responses from Maurin. Therefore, the undersigned finds that the ALJ did not commit reversible error in his analysis of Maurin's responses and that substantial evidence supports the ALJ's decision that plaintiff does not have a marked limitation of function in these two domains as previously addressed herein.

Plaintiff also argues that the ALJ erred by failing to specifically state the weight given to Maurin's questionnaire responses. The undersigned acknowledges that the ALJ should do so. See Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). However, the underlying purpose for requiring the ALJ to state the weight given to each item of evidence is to enable the reviewing court to determine whether or not substantial evidence supports the ALJ's decision. Id. ("What is required is that the ALJ state specifically the weight accorded to each item of evidence and why he reached that decision. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence.")

In the present case, the ALJ specifically identified the evidence in the record which supported his findings and indicated that he relied upon Dr. Davis' opinion, Maurin's questionnaire responses, and her progress report. (Tr. 30-34). The problem plaintiff encounters is that the ALJ chose to rely upon the portion of Maurin's questionnaire responses which do not support plaintiff's position. However, as

26

previously stated herein, it is the ALJ's duty to evaluate the evidence and resolve conflicts. <u>Wolfe</u>, 86 F.3d at 1079.  Moreover, "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision, [] is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole.'" <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1211 (11th Cir. 2005). (citations omitted). Thus, the undersigned finds that the ALJ did not commit reversible error by failing to specifically state the weight given to Maurin's questionnaire responses.

**VII.**  **<u>Conclusion</u>**

For the reasons set forth, and upon consideration of the administrative record, the memoranda of the parties, and oral argument, the decision of the Commissioner of Social Security denying plaintiff's claim for Social Security disability insurance benefits and supplemental security income is

**AFFIRMED.**

**DONE** this 7th day of November, 2005.

<u>s / Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES MAGISTRATE JUDGE**